UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IKIGAI MARKETING WORKS LLC,

                      Plaintiff,

        -against-

LOUIS BROFSKY,

                      Defendant.

24-cv-7864 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

Ikigai Marketing Works LLC ("Ikigai") produces and sells dog-odor-eliminating products for a company called Pooph, Inc. In 2022, Ikigai hired defendant Louis Brofsky to sell Pooph products to Walmart. Ikigai says that Brofsky lied about the amount of Pooph that Walmart planned to order, which led Ikigai to produce over fifty thousand extra units of Pooph that went unsold. Ikigai sued for breach of contract, deceptive business practices, negligent misrepresentation, intentional interference with contractual relations, and a declaratory judgment. Brofsky now moves to dismiss the complaint. For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

Ikigai is a Nevada company that manages the business activities of Pooph, Inc. Aptly named, Pooph produces and sells dog-odor-eliminating products. Dkt. 38 ¶¶ 4, 6. In February 2022, Ikigai hired Brofsky to serve as an independent sales representative. *Id.* ¶ 13. Brofsky's role was to sell Pooph to Walmart. *Id.* Specifically, he was to "solicit and take orders from Walmart at the prices specified by Ikigai," which Ikigai then had discretion to accept. *Id.* ¶ 14. Under the Independent Sales Representative Agreement between Ikigai and Brofsky, Brofsky would be paid 3.5% of the "net cash collected" on all sales of Pooph to Walmart. *Id.* ¶ 17.

Ikigai needed an average of four to six weeks to prepare an order of Pooph for Walmart. *Id.* ¶ 16. However, Ikigai would typically receive a formal purchase order from Walmart approximately one week before the date Ikigai was expected to ship the product. *Id*. Accordingly, Ikigai's "custom and practice" was to begin production of Pooph after "receiving a verbal or written order confirmation from each vendor sales representative, such as [Brofsky]." *Id.* ¶ 15. In other words, "[i]n order to have [Pooph] ready by the ship date, [Ikigai] would begin production immediately upon receiving the order confirmation from [Brofsky], and the official [purchase order] from Walmart would often follow a few weeks later." *Id.* ¶ 16.

This case stems from discrepancies between those unofficial order confirmations from Brofsky and the official purchase orders from Walmart. Ikigai alleges that Brofsky "received various order

confirmations from the Walmart Buyer, . . . and would in turn communicate an entirely different order quantity to Ikigai from what the Walmart Buyer sent [Brofsky]." *Id.* ¶ 18. From June 2024 to August 2024, Brofsky communicated to Ikigai that Walmart planned to order 224,784 units of Pooph between August and November 2024. *Id.* ¶ 19. But the official purchase orders that Ikigai received from Walmart requested only 169,488 units, 55,296 less than Ikigai expected. *Id.* Because Ikigai's practice was to produce orders before it received the formal purchase orders, Ikigai had already produced these units, which were "manufactured and customized specifically for Walmart and could not be resold to another retailer." *Id.* ¶ 20. Walmart rejected the additional units, which caused Ikigai $527,524 in damages. *Id.* ¶¶ 21, 23.

The agreement between Brofsky and Ikigai contained a termination provision that required either party to give six-months' advance notice to terminate the agreement. *Id.* ¶ 24. On September 12, 2024, Ikigai sent a termination letter to Brofsky, explaining that it was terminating the agreement immediately "for cause," which allowed it to circumvent the notice period. *Id.* ¶ 25; *see also* Dkt. 38-1 at 4. Ikigai advised Brofsky that he was no longer authorized to act on its behalf with Walmart. Dkt. 38 ¶ 25. On October 1, 2024, Brofsky sent a letter to Ikigai, "outlining reasons why the Agreement should remain in effect for an additional six (6) months and demanding that Ikigai withdraw its notice to Walmart to allow him to continue placing orders with Walmart." *Id.* ¶ 26. On October 3, 2024, Ikigai responded to Brofsky, "reiterating its basis for the demand to terminate the Agreement for cause and that Ikigai would not retract its notice to Walmart." *Id.* ¶ 27.

On October 16, 2024, Ikigai sued Brofsky. *See* Dkt. 1. Brofsky filed a motion to dismiss, which the Court denied as moot after Ikigai filed an amended complaint. *See* Dkt. 28. After Brofsky moved to dismiss the amended complaint, the Court ordered Ikigai to amend its complaint to properly allege diversity of citizenship. *See* Dkt. 36. Ikigai filed a second amended complaint on March 21, 2025, which alleges claims of breach of contract, deceptive business practices, negligent misrepresentation, and intentional interference with contractual relations. Dkt. 38 ¶¶ 29–80. Ikigai asks for a declaratory judgment in addition to damages and injunctive relief. *See id.* ¶¶ 81–87. The Court exercises its discretion to "evaluat[e] [Ikigai's pending motion to dismiss the first amended complaint] in light of the facts alleged in the [second] amended complaint." *See Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 303–04 (2d Cir. 2020).

## LEGAL STANDARDS

To survive a motion to dismiss for failure to state a claim, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 298–99 (2d Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* at 299 (quoting *Iqbal*, 556 U.S. at 678). When evaluating whether a complaint clears this bar, the Court must "accept[] all factual allegations in the complaint as true[] and draw[] all

2

reasonable inferences in the plaintiff's favor." *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).

## DISCUSSION

### I.    The Contract Claim Survives

Brofsky argues that Ikigai's breach-of-contract claim must be dismissed for seven reasons. None is convincing.

First, Brofsky points to the fact that under the agreement, "[a]ll orders from customers . . . are subject to acceptance by [Ikigai] at its sole discretion." Dkt. 38-1 at 2. Brofsky says this language "presupposes that [Ikigai] will review and approve any orders before accepting them." Dkt. 30 at 9 (capitalization and emphasis omitted). "Accordingly," says Brofsky, Ikigai "had to provide written notice of the order it was accepting before treating a communication as binding— something [Ikigai] does not allege happened." *Id.*

Brofsky's argument seems to be that Ikigai wasn't allowed under the contract to treat his communications about Walmart's orders as binding without some written communication that it was "accepting" those orders. But it's not clear how this is relevant to Ikigai's breach-of-contract claim. Ikigai claims that Brofsky breached section 1.03(a) of the agreement, which provides that Brofsky "shall use [his] best efforts to promote, distribute, and sell [Pooph] for [Ikigai] within the Territory," Dkt. 38-1 at 1, by "repeatedly miscommunicat[ing] orders submitted to him by the Walmart Buyer." Dkt. 38 ¶¶ 34–35. In other words, Ikigai's breach-of-contract claim isn't premised on the idea that it was required to accept the orders that Brofsky communicated, but rather that Brofsky had a duty under the contract to accurately communicate Walmart's orders.

Second, Brofsky claims that Ikigai's "definition of 'orders' shifts throughout the [complaint], rendering its allegations vague and incoherent." Dkt. 30 at 9 (capitalization omitted). Brofsky points out that the complaint sometimes uses the term "orders" to refer to formal purchase orders Ikigai received from Walmart, while elsewhere it uses "orders" to refer to the verbal or written confirmations it received from Independent Sales Representatives like Brofsky. *Id.* at 9–10. But it's not clear why this claimed ambiguity is a basis to dismiss the complaint. The complaint lays out the difference between formal purchase orders and verbal or written order confirmations from sales representatives and explains how both factor into its business operations. *See* Dkt. 38 ¶¶ 14–16. Moreover, Brofsky's argument is again premised on the misconception that Ikigai is alleging that it was bound to accept Brofsky's written orders. *See* Dkt. 30 at 10 ("Paragraph 15 concedes that Walmart's purchase orders were issued weeks later, confirming that any prior 'order confirmations' were nonbinding."). As the Court explained above, Ikigai's breach-of-contract theory is instead premised on Brofsky's "fail[ure] to use his best efforts to promote, distribute[,] and sell" Pooph by misrepresenting Walmart's orders. Dkt. 38 ¶ 34.

Third, Brofsky says that Ikigai's allegations that he "'confirmed' orders are vague, conclusory, and inadequate." Dkt. 30 at 10 (capitalization omitted). Specifically, Brofsky takes issue with the fact that the complaint "fails to specify to whom, how, or in what form the alleged confirmation[s]

w[ere] made." *Id.* But Brofsky fails to cite any authority suggesting that this kind of factual specificity is required at the pleading stage for a breach-of-contract claim. Accepting all factual allegations in the complaint as true and drawing all inferences in Ikigai's favor, Brofsky communicated to Ikigai that Walmart planned to purchase 224,784 units of Pooph, when in fact Walmart had told Brofsky that it only planned to purchase 169,488 units. Dkt. 38 ¶ 19. There's nothing vague or conclusory about these factual allegations, which the Court is obligated to treat as true on a motion to dismiss.

Fourth, Brofsky takes issue with a specific paragraph in the complaint alleging that "when asked to copy his manager on all correspondence with Walmart, [Brofsky] intentionally failed to do so, seemingly[] in an effort to conceal the true nature of his conversations with Walmart from Ikigai." *Id.* ¶ 38. Brofsky says this claim is "implausible," contradicted by other evidence, and based on "[r]ank speculation." Dkt. 30 at 12–13. He also says that the complaint fails to tie the email to the alleged misstatements, that the terms of the contract allowed Brofsky to decide what "techniques of sale and methods of follow-up" to use, and that Ikigai "does not allege any damages resulting from the one allegedly unsent email." *Id.* (emphasis omitted). But Ikigai doesn't allege a breach based solely on this email; it cites the email merely as "further evidence of [Brofsky's] breach of the Agreement." Dkt. 38 ¶ 38.

Fifth, Brofsky says that Ikigai "fails to adequately allege facts demonstrating its own performance—an essential element of a breach of contract claim." Dkt. 30 at 13. Ikigai alleges that it "fulfilled and performed all terms and conditions required under the Agreement, which included approving orders solicited and taken by [Brofsky], paying [Brofsky] commissions on the net cash collected[,] and providing [Brofsky] reports as specified in the Agreement." Dkt. 38 ¶ 32. "In the alternative," Ikigai says that "to the extent that [it] did not perform all terms and conditions required under the Agreement, its non-performance was excused by willful breach and misconduct of [Brofsky]." *Id.* ¶ 33. Brofsky argues that by using the term "to the extent that," Ikigai admits that it must have failed to perform its obligations to some extent. Dkt. 30 at 14. This argument fails because Ikigai plainly alleges that it performed its obligations; it merely pleads that its performance was excused as an alternative theory. Brofsky argues that these claims are inconsistent, but "Federal Rule of Civil Procedure 8[(d)(3)] permits pleading inconsistent theories in the alternative," as Ikigai does here. *Kruse v. Wells Fargo Home Mortg., Inc.*, 383 F.3d 49, 55 n.3 (2d Cir. 2004). Nor is it relevant that these theories are pled "as part of the same claim," as Brofsky suggests. Dkt. 30 at 14. Rule 8(d)(2) provides that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."

Sixth, Brofsky argues that Ikigai fails to adequately plead damages. Brofsky says that the complaint "fail[s] to establish any plausible link between Brofsky's alleged misrepresentation(s) and [Ikigai's] claimed damages." *Id.* at 16. But according to the complaint, there was a direct link between Brofsky's alleged misrepresentation—that Walmart wanted 224,784 units of Pooph—and Ikigai's damages—that it made 55,296 units that Walmart rejected and that "could not be resold to any other buyer." *See* Dkt. 38 ¶¶ 19–23. Brofsky points out that Ikigai has continued to sell

Pooph products to Walmart and suggests that these units could have been sold to Walmart as part of a different order. Dkt. 30 at 16; *see also* Dkt. 38 ¶ 42. But on a motion to dismiss, the Court draws all inferences in Ikigai's favor, and the obvious implication of Ikigai's factual allegations is that it could not recoup its losses by simply selling the product to Walmart a few months later.

Finally, Brofsky argues that Ikigai's claim "is not just implausible—it defies common sense." Dkt. 30 at 16. He argues that it "makes no sense" that Brofsky "somehow, and for no discernable reason, falsely 'confirmed' Walmart's projected orders as binding commitments." *Id.* If Ikigai had been acting in good faith, says Brofsky, it would have asked him about the discrepancies before terminating the agreement. *Id.* at 17. But whether factual allegations "make sense" is not the standard on a motion to dismiss. *See Pappanikolaou v. New York City*, 2005 WL 1661649, at *13 n.5 (E.D.N.Y. July 14, 2005) ("In theory, even seemingly bizarre factual allegations in the complaint must be accepted as true."). Brofsky doesn't explain why the allegations, if taken as true, fail to constitute a plausible breach of the agreement's provision requiring Brofsky to "use [his] best efforts to promote, distribute, and sell the Products for [Ikigai] within the Territory." Dkt. 38-1 at 1. Accordingly, the breach-of-contract claim survives.

## II.     The Remaining Substantive Claims Survive

Ikigai alleges that Brofsky engaged in deceptive business practices in violation of the Nevada Deceptive Trade Practices Act and that he is liable for negligent misrepresentation and intentional interference with contractual relations in violation of Nevada common law. *See* Dkt. 38 ¶¶ 45–80. Brofsky offhandedly suggests that New Jersey law should govern these claims but ultimately argues that they should be dismissed for various reasons even under Nevada law. Dkt. 30 at 18–20. In two pages, Brofsky presents eighteen reasons for dismissal in a numbered list. The list contains mostly single sentences, generally followed by a case citation or two.

It isn't the Court's job to develop a series of one or two-sentence morsels into an argument to dismiss the complaint. *See SOHC, Inc. v. Zentis Food Sols. N. Am., LLC*, 2014 WL 6603951, at *1 (S.D.N.Y. Nov. 20, 2014) ("[A] 'single, conclusory, one-sentence argument' is insufficient to raise an issue in the first instance." (quoting *Cuoco v. Mortisugo*, 222 F.3d 99, 112 n.4 (2d Cir. 2000))). And Brofsky can't circumvent the Court's page-limit requirement for motions by hoping that the Court will do so. It's Brofsky's job to select his strongest arguments for dismissing the complaint and clearly communicate those arguments to the Court, explaining both the applicable law and its application to the complaint. Because he fails to do that here, the Court disregards Brofsky's arguments for dismissing counts two through four. *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are [ordinarily] deemed waived." (citation omitted)). Brofsky is free to present these arguments in a more developed manner on summary judgment.

## III.     The Declaratory-Relief Claim Is Dismissed

The fifth "cause of action" in Ikigai's complaint is a "request for declaratory relief." Dkt. 38 ¶¶ 81–87. As Brofsky points out, however, the Declaratory Judgment Act "provides a remedy, not

a cause of action." *Garland v. City of New York*, 665 F. Supp. 3d 295, 304 (E.D.N.Y. 2023) (citation omitted). Accordingly, "[Ikigai] cannot sustain an independent cause of action for a declaratory judgment." *Spectre Air Cap., LLC v. WWTAI AirOpCo II DAC*, 737 F. Supp. 3d 195, 210 (S.D.N.Y. 2024). However, "this ruling should not be construed as a finding that [Ikigai] may not seek a declaratory judgment as a remedy for its . . . claims." *Id.* at 211.

## CONCLUSION

For these reasons, Brofsky's motion to dismiss is GRANTED IN PART and DENIED IN PART.

The Clerk of Court is directed to terminate Dkt. 29.

SO ORDERED.

Dated: April 23, 2025
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge